Filed 10/25/22 Via Appia v. Marcus & Millichap Real Estate Investment etc. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| VIA APPIA, LLC,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>MARCUS & MILLICHAP REAL ESTATE INVESTMENT SERVICES, INC., et al.,<br><br>     Defendants and Respondents. | F080496<br><br>(Super. Ct. No. 10684)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Mariposa County. F. Dana Walton, Judge.

Newmeyer & Dillion, Alan H. Packer, Brandon A. Clouse; The Ware Practice Group, Mindy L. Ware and James Ware for Plaintiff and Appellant.

Neumiller & Beardslee, Paul N. Balestracci and Ricardo Z. Aranda for Defendants and Respondents.

-ooOoo-

Plaintiff Via Appia, LLC (Via Appia) and another entity co-owned a parcel of grazing land with development potential. After holding the parcel for a decade, they decided to list it for sale with a real estate brokerage firm. When the parcel did not sell,

Via Appia sued the co-owner, the real estate firm, and its agents, alleging they concealed material information from Via Appia.

This appeal involves the motion for summary judgment by the real estate firm and its agents, which asserted Via Appia could not establish that their alleged misconduct resulted in any damages. The trial court agreed. First, as to costs incurred by Via Appia—such as fees for permitting and engineering services—the court concluded the element of causation was negated because those costs were incurred *solely* as the result of the agreement between Via Appia and the co-owner, not because of any misconduct by the firm and its agents. Second, as to damages based on a lost sale or lost development opportunity, the court determined those damages were uncertain, based upon conjecture, and speculative because a sale could not take place without the agreement of both owners.

The element of causation usually is a question of fact and it is resolved using the substantial factor test. Applying that test, we conclude a reasonable person could find that the failure of the real estate firm and its agents to disclose information to Via Appia was a factor contributing to the costs incurred by Via Appia while the property was listed with the firm. In other words, there are triable issues of material fact as to whether Via Appia incurred damages as a result of the alleged misconduct.

We therefore reverse the judgment.

## FACTS

In 2005, Via Appia, acquired an undivided one-third interest in a 786-acre parcel located on Highway 49 North in Mariposa and known as APN 012-120-007 (the Property). Via Appia has only two members, Frank Berlogar and Pete Ruggeri. Berlogar is the managing member. Berlogar, a geotechnical engineer, and Ruggeri, a civil engineer, have substantial experience in real estate matters, including large parcels like the Property.

2.

Defendant OP Development, Inc. (OPD) acquired the remaining two-thirds interest in the Property pursuant to a grant deed recorded in early 2006. Defendant Gregory Opinski is the president of OPD OPD also owns a 200-acre parcel known as APN 012-140-013, which is adjacent to the Property (Adjacent Property).

Via Appia and OPD agreed that the Property had a substantial upside for development and agreed to jointly work towards obtaining entitlements that would increase its value. Starting in 2006, they took steps toward that goal, including retaining a land use attorney, hiring a biologist, working with a local engineering and land use planning firm, preparing conceptual plans, retaining a water drilling company to drill wells to determine if the site was able to provide its own water, and other actions.

With the economic downturn in 2008, Via Appia and OPD agreed to put further efforts on hold until the economy improved. In 2010, they listed the Property for sale for $10 million, with the net proceeds to be split one-third and two-thirds. No sale was completed.

In 2014, Via Appia and OPD discussed resuming efforts to obtain entitlements. They again agreed that Via Appia would pay one-third of the expenses and OPD would pay two-thirds. They retained Garth Pecchenino, a land planner, engineer and land surveyor who had previously worked on the project. In 2014 and 2015, Pecchenino was employed by Quad Knopf, Inc. He performed due diligence focused on land planning and entitlements. The owners also hired a land use attorney.

In January 2015, Via Appia and OPD entered into an "Exclusive Representation Agreement" with defendant Marcus & Millichap Real Estate Investment Services, Inc. (Marcus & Millichap) to list and market the Property. Defendant Ronald Swim and defendant Earle Hyman are real estate agents affiliated with Marcus & Millichap. Swim was primarily responsible for marketing the Property and Hyman provided assistance. Marcus & Millichap, Swim and Hyman are the respondents in this matter and are referred to collectively as "Brokers."

3.

Under the exclusive representation agreement, Via Appia and OPD agreed to accept an offer to purchase the Property for $19.65 million ($25,000 per acre) and pay Brokers a 6 percent commission. The term of the agreement ran from January 16, 2015, until January 16, 2016.[1] The agreement described Via Appia and OPD as a "joint venture." Via Appia and OPD both needed to agree to accept any offer to purchase the Property.

The exclusive representation agreement did not expressly authorize Brokers to (1) "bundle" the Property with other properties—that is, market it in combination with another property—or (2) run all communications through Opinski. On July 2, 2015, Berlogar sent Swim an e-mail stating that Ruggeri and he had not given Brokers permission to have Opinski be Brokers' point of contact and "ask[ed] that you report to [Ruggeri] and me as well as [Opinski]."

Via Appia entered into the exclusive representation agreement without being informed by OPD or Brokers that they had discussed Brokers representing OPD in the sale of the Adjacent Property. In November 2014, Swim signed an exclusive representation agreement for the Adjacent Property on behalf of Marcus & Millichap. Opinski signed that agreement on behalf of OPD on January 16, 2015—the same day he signed the exclusive representation agreement relating to the Property. The agreement stated OPD would accept an offer to purchase the Adjacent Property for $5 million ($25,000 per acre). Via Appia first learned of the existence of the agreement relating to the Adjacent Property during discovery, before Brokers were added as defendants in September 2016.

Brokers prepared an offering memorandum for "Princeton Ranch," which consisted of the Property and Adjacent Property. At a March 17, 2015 meeting attended by Swim and Berlogar, Swim presented Berlogar with a draft of the offering

---

[1] The agreement expired by its terms and was not renewed or extended.

4.

memorandum. This was the first notice that Berlogar had that the Property and Adjacent Property had been bundled for sale. During his deposition, Berlogar testified (1) he was surprised to see the two properties bundled, (2) he raised the issue with Swim, (3) Swim did not give him a direct response, and (4) Berlogar did not object or preclude Swim for disseminating the offering memorandum. Berlogar explained his reticence by stating that he tended to be an optimist, he had just wrapped up his second divorce and really needed cash, and he hoped a deal would come together. Similarly, when Berlogar received the final version of the offering memorandum attached to a March 26, 2015 e-mail, he did not object to Swim or to Opinski about the bundling. Berlogar stated he "figured that was a battle we'd fight when we got an offer."

During the listing period, two entities expressed interest in the Property. In May 2015, Hartford Land Management sent Brokers a letter relating to a potential purchase of the Property. Brokers informed Opinski of the proposal, but did not inform Via Appia. During his deposition, Berlogar testified he thought that, ultimately, three offers were received from Hartford Land Management and the first was a "pie-in-the-sky offer" in that it had a low price, was loaded with contingencies, and had a long duration. When asked if Via Appia would have accepted it at that time, Berlogar (1) stated he thought that he and the other member of Via Appia would not have accepted it at that time and (2) characterized the offer as the start of the negotiating process.

On May 27, 2015, a broker representing Hartford Land Management e-mailed Swim and Hyman stating his client understood the position the seller of Princeton Ranch was in, but his client would not respond further without seeing a written counter from the seller. The e-mail also stated: "If the seller has to wait until such time as the divorce proceedings will be at a stage where he feels safe to respond in writing, that's fine." There was never an agreement to purchase the Property that Hartford Land Management would sign.

5.

In June 2015, Brokers received an inquiry about the Property from someone purporting to be Kai Murray of Kulibayev Conglomerates. Murray's e-mails listed his title as "First Deputy General Director CFO" and included a street address in Almaty, Kazakstan. Brokers informed Opinski of the inquiry, but did not inform Via Appia. Opinski and Brokers suspected the offer from Murray to purchase the Property was not legitimate, in part because it avoided escrow and required the sellers to provide buyer $4 million before the buyer would provide any funds. In their depositions, Opinski and Swim described the inquiries from Murray as a scam.

OPD did not agree to accept the offers of Hartford Land Management or Kulibayev Conglomerates. Aside from any duties it might have owed its joint venturer, OPD was not required to accept any offer to purchase the Property. In addition, Brokers did not have any authority to force OPD to accept any offer to purchase the Property.

While the exclusive representation agreement was in effect, Opinski was going through divorce proceedings.[2] During his deposition, Opinski testified that he was going full steam ahead on developing both projects—that is, Princeton Ranch and a property in Merced—when his divorce attorney raised some concerns. After that conversation, Opinski decided it was in his best interest to pull both properties off the market and "[t]hat's what I directed [Brokers] to do per advice." Opinski also told Brokers that as soon as he figured out what he could and could not do, he would get back to them and let them know.

On June 2, 2015, Hyman e-mailed Opinski to confirm the instructions. The e-mail stated that Brokers had been instructed to take both properties off Brokers' system "as you are not able at this time to respond to any written offer" and when Opinski's situation had changed and he was able to respond to offers in writing, Brokers would put the

---

[2]     That proceeding has generated an appeal to this court, *Rosetta Opinski v. Gregory Opinski*, case No. F082501. The record in that case shows Rosetta filed a petition for dissolution of marriage in September 2014.

6.

properties back into the system and continue to market them. Opinski responded with an e-mail stating: "Correct lets remove them until I know more information on the status of the divorce."

**PROCEEDINGS**

This lawsuit began in August 2015 when Via Appia filed a complaint for partition of real property against OPD, the State of California, and three utility companies. In September 2016, after conducting discovery which revealed the exclusive listing agreement for Marcus & Millichap to market the Adjacent Property, Via Appia filed a second amended complaint that named Brokers as defendants. In March 2019, Via Appia filed its third amended complaint (TAC), which is the operative pleading in this appeal.

The TAC's 11th through 14th causes of action were brought against Brokers and alleged (1) professional negligence, (2) breach of fiduciary duty, (3) fraud by concealment, and (4) breach of contract. Brokers' motion for summary judgment did not challenge the allegations that Brokers owed various duties to Via Appia and that they breached their contractual, fiduciary and professional duties.

Via Appia contends Brokers breached its duties by (1) bundling the Property with the Adjacent Property without Via Appia's prior consent, (2) concealing offers from it, (3) making counter offers it did not authorize, (4) concealing those counter offers, (5) failing to disclose material facts about Opinski's divorce and Opinski's instructions about removing the Property from Brokers' listing, (6) ignoring Via Appia's explicit instructions to keep it in the loop regarding the marketing of the Property, and (7) acting in concert with Opinski to conceal material facts despite the clear harm to Via Appia.

The TAC's causes of action against Brokers addressed the element of damages by alleging that, as a proximate result of Brokers' wrongdoing, Via Appia suffered direct, consequential, general and special damages including but not limited to out of pocket costs, lost profits from the sale, entitlement or development of the Property that otherwise would have occurred but for Brokers' wrongdoing, loss or diminution of value in the

7.

Property, increased costs and liabilities, as well as other damages. In the fraud by concealment cause of action, Via Appia addressed the element of reliance by alleging that, had the material facts concealed by Broker been disclosed, Via Appia "reasonably would have acted differently to avoid or decrease the damages it ha[d] suffered as a result of the deception and concealment engaged in by [Brokers]."

In April 2019, Brokers filed an answer generally denying all allegations and pleading 17 affirmative defenses. Brokers' fifth affirmative defense alleged that any damage to Via Appia was caused solely by the acts or omissions of parties other than them. Brokers' seventeenth affirmative defense alleged Via Appia's injuries were proximately caused by independent intervening or supervening causes.

*Motion for Summary Judgment*

In June 2019, Brokers filed and served a motion for summary judgment, or in the alternative, summary adjudication of the four causes of action alleged against them. Brokers' separate statement of undisputed material facts asserted Brokers were entitled to summary adjudication of each cause of action because Via Appia could not establish the required element that it suffered damage caused by any of their alleged conduct. The separate statement contained 49 paragraphs that Brokers asserted contained undisputed material facts. Paragraph 41 asserted that "Via Appia has not been able to articulate an amount it has been damaged as a result of [Brokers'] conduct." Brokers supported this assertion of fact by citing Berlogar's deposition and Via Appia's responses to interrogatories and requests for admission.

Via Appia's separate statement in opposition to Brokers' motion for summary judgment disputed the assertion that it had been unable to articulate an amount of damage resulting from the conduct of Brokers. Via Appia asserted it has suffered damages (1) by incurring out of pocket expenses for the development and entitlement of the Property, (2) from lost profits from sales, and (3) lost opportunity costs. More specifically, Via Appia asserted: "Between 2006 and 2015, Via Appia's total costs were $158,124.36:

8.

$10,197.53 in legal fees; $6,806.64 in groundwater consultants; $22,462.73 in drilling; $96,110.19 in engineering services; $7,122.09 in civil engineering; and $15,425.18 in environmental engineering."[3] Via Appia also asserted it spent thousands of dollars on pre-entitlement work *during the listing period* (Jan. 15, 2015 to Jan. 15, 2016) in reliance on the property being marketed and sold by Brokers. Further details about the expenses Via Appia incurred during the listing period are set forth in part II.B. of this opinion.

*Trial Court Ruling*

On October 11, 2019, the trial court filed an order granting Brokers' motion for summary judgment.[4] The order addressed two categories of damage. First, the order stated "there is no causal connection between the conduct of [Brokers] and costs incurred on behalf of V[ia Appia], which were incurred solely as the result of the agreement between V[ia Appia] and O[P Development, Inc]." Second, the order stated that because "a sale could not take place without the agreement of both parties, an no offer to purchase the property was accepted by the parties, no sale occurred, so any claim for damages based on lost development opportunity and a loss of sale are uncertain, are based upon conjecture and are speculative."

The order recognized that Via Appia had submitted evidence that it and OPD incurred costs during the term of the exclusive representation agreement, but concluded

---

**3**      This list of costs incurred was set forth in Via Appia's amended responses to Via Appia's fourth set of special interrogatories. The amended responses were dated August 7, 2019—two months after Brokers' moving papers were filed.

**4**      The same day, the trial court also filed an order denying the separate motion for summary judgment filed by OPD and Opinski. On the cause of action for partition of the Property, the court determined there was a triable issue of fact as to whether partition in kind or by sale was more equitable. On the causes of action for breach of contract, breach of fiduciary duty, and fraud by concealment, the court determined triable issues of fact existed, including but not limited to, whether Via Appia incurred damages as a result of Opinski's alleged wrongdoing. In May 2022, the trial court entered a judgment of partition by sale. Via Appia appealed and case No. F084595 was assigned to the matter.

9.

the evidence did not create a triable issue of material fact regarding damages caused by Brokers' conduct. The order reiterated that the costs were incurred solely as a result of the agreement between Via Appia and OPD

Later that October, Brokers served and filed a notice of entry of the order and judgment. In December 2019, Via Appia filed a notice of appeal challenging the judgment and noting the existence of a pending motion for new trial.[5]

## DISCUSSION

### I. BASIC PRINCIPLES OF SUMMARY JUDGMENT

#### A. Standard of Review

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (§ 437c, subd. (c).) When reviewing the grant of a motion for summary judgment, appellate courts "independently review the record and apply the same rules and standards as the trial court." (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 121.) The applicable rules and standards are incorporated into a three-step analysis. (*Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1602 (*Brantley*); see Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2022), ¶ 8:166, pp. 8-146, 8-147 [appellate courts use same three-step analysis required of trial court].) Independent review is appropriate because whether a trial court erred in conducting this analysis and granting a motion for summary judgment presents questions of law. (*Samara v. Matar* (2018) 5 Cal.5th 322, 338.)

---

[5] On October 24, 2019, Via Appia filed a notice of intent to move for a new trial. The motion for new trial was filed on November 1, 2019, and included the argument that the breach of contract claim must be allowed to proceed because nominal damages could be awarded. Brokers' opposition argued that nominal damages are not automatic and, moreover, Via Appia waived the argument by not raising it before the summary judgment motion was decided. On January 10, 2020, the court denied the motion. This opinion does not reach the issues involving Via Appia's claim to nominal damages for breach of contract.

B.     Step One:  Framing the Issues

The first step in analyzing a motion for summary judgment is to "identify the issues framed by the pleadings," because the motion must show "there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading."  (*AARTS Productions*, *Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064; see *Brantley*, *supra*, 42 Cal.App.4th at p. 1602.)  When, as here, a defendant moves for summary judgment, it has the "burden of showing [each] cause of action has no merit."  (§ 437c, subd. (p)(2).)  A defendant can carry this burden by showing "that one or more elements of the cause of action … cannot be established."  (*Ibid*.)

Here, the TAC alleges four causes of action against Brokers:  (1) professional negligence, (2) breach of fiduciary duty, (3) fraud by concealment, and (4) breach of contract.  It is undisputed that, under California law, each of these causes of action include causation and damages as essential elements.

Brokers' moving papers completed the first step of the summary judgment analysis by asserting Via Appia cannot establish Brokers' allegedly wrongful conduct caused Via Appia to suffer any damages—that is, by targeting the elements of causation and damages.  We conclude Brokers have accurately identified "elements of the cause[s] of action" alleged by Via Appia.  (§ 437c, subd. (p)(2).)  Accordingly, Brokers will be entitled to summary judgment as a matter of law if the undisputed material facts establish their alleged acts and omissions did not *cause* **any** *damage* to Via Appia.  We note here that Brokers did not move for "summary adjudication of … a claim for damages other than punitive damages that does not completely dispose of a cause of action" in accordance with the procedures set forth in subdivision (t) of section 437c.  As a result, we need not consider every category or type of damage Via Appia alleges was caused by Brokers' misconduct.  If a triable issue of material fact exists as to any category or type of damage, Brokers' motion must be denied.

11.

C.    Steps Two and Three:  Shifting Burdens

In *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, the Supreme Court described the second and third steps of the summary judgment analysis in terms of the burdens placed on each party:

> "[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law.  That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon.  [Citation.]  There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof....  [¶] ...  [T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact....  A prima facie showing is one that is sufficient to support the position of the party in question.  [Citation.]"  (*Id.* at pp. 850-851, fns. omitted; see *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878.)

Accordingly, the second step of the summary judgment analysis requires the court to determine whether the moving party's showing has established facts justifying judgment in its favor. (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 858.)  When the moving party has carried its initial burden, the court proceeds to the third step and determines whether the opposing party has demonstrated the existence of a triable issue of material fact. (*Ibid.*)  Appellate courts "view the evidence in a light favorable to plaintiff as the losing party." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)  Consequently, a losing plaintiff's evidentiary submission is liberally construed, and the moving party's showing is strictly scrutinized with any evidentiary doubts or ambiguities resolved in plaintiff's favor. (*Ibid.*)  Stated another way, when conflicting inferences can be reasonably drawn from the evidence, a triable issue of fact is deemed to exist. (Code Civ. Proc., § 437c, subd. (c).)

Reviewing courts often combine the second and third steps and address the ultimate question of whether there is a triable issue of material fact. For instance, in *Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, the Supreme Court stated:

> " 'Defendants are entitled to summary judgment only if "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [Citation.] To determine whether triable issues of fact do exist, we independently review the record that was before the trial court when it ruled on defendants' motion. [Citations.] In so doing, we view the evidence in the light most favorable to plaintiffs as the losing parties, resolving evidentiary doubts and ambiguities in their favor.' " (*Id*. at pp. 605–606.)

Under this approach, the ultimate question in this appeal is whether there is a triable issue of material fact as to whether Brokers' allegedly wrongful acts and omissions caused *any* damage to Via Appia.

II.    TRIABLE ISSUE OF MATERIAL FACTS

Our analysis of Brokers' contention that their allegedly wrongful acts and omissions did not cause any of the damages claimed by Via Appia begins by identifying the damages Via Appia alleged were caused by Brokers.

A.    Allegations of Damage, Causation and Reliance

Each of Via Appia's four causes of action against Brokers alleged that, as a direct and proximate cause of Brokers' wrongful conduct, Via Appia "has suffered direct, consequential, general and special damages." Via Appia also alleged these four categories of damages included but were "not limited to out of pocket costs, lost profits from sale of the Property…, lost profits from the entitlement of the Property …, lost profits from the development of the Property …, loss of value in the [P]roperty …, diminution in value of the Property, increased costs and liabilities, attorneys' fees and litigation costs, as well as other damages." In addition, Via Appia's cause of action for fraud by concealment addressed reliance or causation by alleging that, had the material

13.

facts concealed by Broker been disclosed, Via Appia "reasonably would have acted differently to avoid or decrease the damages it ha[d] suffered as a result of the deception and concealment engaged in by [Brokers]."

We, like the trial court, recognize Via Appia's alleged damages fall into two broad categories: (1) a loss of sale or development opportunity and (2) costs incurred. Next, we consider the costs incurred—that is, the expenses that would not have been incurred but for Brokers' alleged wrongful conduct. (See *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1052 [California's substantial factor test for causation subsumes the " 'but for' " test for causation in fact].)

## B. Expenses Incurred

The trial court explicitly addressed Via Appia's claim that the Brokers' failures to disclose material information caused Via Appia to incur expenses that it would not have incurred if it been fully informed. First, the court recognized that Via Appia had submitted evidence that both OPD and Via Appia had incurred costs during the term of their exclusive representation agreement with Brokers. The court cited paragraphs 3 through 22 of Berlogar's declaration as support.

Paragraph 20 of Berlogar's declaration stated that in 2014, Via Appia and OPD agreed to resume efforts to obtain entitlements, agreed Via Appia would pay one-third of the expenses and OPD would pay two-thirds, and retained "Quad Knopf to perform further due diligence focused on land planning and entitlements." Paragraph 21 of the declaration asserted that payments were made to various named entities (including Quad Knopf) in connection with the due diligence and further asserted that in excess of $261,448.57 in development and operating expenses had been incurred by Via Appia. These expenses started to be incurred in early 2006, when due diligence began.

Many of Via Appia's expenses were incurred before Brokers became involved. Paragraph 38 of Berlogar's declaration set forth Via Appia's theory of causation by

14.

asserting that, had Via Appia been properly informed, it "would never have paid the costs [it] paid."**6** Addressing Brokers' initial failure to disclose, Berlogar asserted that if Via Appia had "been advised ahead of time on the bundling, we could have avoided paying an unequal share of the entitlement costs and development costs." Addressing a later failure to disclose, Berlogar asserted:

> "Had we been told that [Brokers] would be pulling the listing and that it would be working with Opinski to remove the property from the market and Opinski would be unilaterally putting the consultants on hold due to his divorce, we would never have invested further funds in the project, which we did during the time period in which the property was listed with [Brokers]."

As to particular expenses incurred, Berlogar's declaration did not set forth each item incurred pursuant to the agreement of Via Appia and OPD to split the costs. Instead, paragraph 17 of Berlogar's declaration referred to a document that summarized all amounts incurred by Via Appia, which was attached to the declaration as Exhibit I. Exhibit I is a two-page document titled "Via Appia LLC Expense Detail by Account." The seven accounts (with totals) listed are property taxes ($104,702.31), nonlitigation legal fees ($10,197.53), groundwater consultant ($7,750.01), drilling ($22,462.73), engineering services ($103,986.25), civil engineer ($7,122.09), and environmental engineer ($15,425.18). Paragraph 17 of Berlogar's declaration also referred to an attachment designated Exhibit J, which consisted of copies of invoices and related documents (to the extent available to Berlogar) supporting the expenses listed in Exhibit I.

One entry in Exhibit I for engineering services shows Via Appia paid OPD $56.33 on March 11, 2015, for Quad Knopf. Exhibit J includes a January 31, 2015 invoice from

---

**6** We note that Brokers' evidentiary objection No. 13, which asserted statements made in paragraph 38 of Berlogar's declaration were merely conclusory and argumentative, was overruled by the trial court.

Quad Knopf to Opinski for one hour of engineering services that totaled $169.00. Because one-third of $169.00 is $56.33, this invoice supports the entry in Via Appia's list of expenses by account.

Another entry in Exhibit I for engineering services shows Via Appia paid Quad Knopf $1,160.30 on July 14, 2015, and refers to "80927." Exhibit J includes Quad Knopf invoice No. 80927 dated June 30, 2015, that shows a total of 23.6 hours incurred and a filing fee, for a total invoice amount of $3,480.90. Via Appia's one-third share of this amount is $1,160.30. Exhibit J also contains a photocopy of a document labeled "PAYMENT RECORD" that appears to have been generated when Via Appia prepared a check for $1,160.30 to pay its share of the invoice. Consequently, the documents in Exhibit J support the entry in Via Appia's list of expenses showing that $1,160.30 was paid to Quad Knopf in July 2015.

Based on the portions of Berlogar's declaration that were not eliminated by the trial court's rulings on Brokers' evidentiary objections and the supporting documents in Exhibits I and J to the declaration, we conclude the record contains evidence sufficient for a reasonable trier of fact to find that Via Appia incurred expenses for engineering services after Via Appia and Brokers executed the exclusive representation agreement in January 2015. Consequently, the next question is whether the evidence in the record is sufficient to create a triable issue of fact as to whether Brokers' failure to disclose information *caused* Via Appia to incur those expenses.

C.      Causation

   *1.      Legal Principles Defining Causation*

"A fundamental rule of law is that 'whether the action be in tort or contract compensatory damages cannot be recovered unless there is a causal connection between the act or omission complained of and the injury sustained.' " (*McDonald v. John P. Scripps Newspaper* (1989) 210 Cal.App.3d 100, 104.) The California Supreme Court has

adopted the substantial factor test for triers of fact to use in determining whether a wrongful act or omission proximately caused an injury. (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968; *Mitchell v. Gonzales, supra*, 54 Cal.3d at pp. 1050–1053.) CACI No. 430, "Causation: Substantial Factor," states: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm." "[T]he 'substantial factor' test subsumes the 'but for' test" for causation in fact. (*Mitchell, supra,* at p. 1052.)

The substantial factor test is a relatively broad one. (*South Coast Framing, Inc. v. Workers' Comp. Appeals Bd.* (2015) 61 Cal.4th 291, 298.) It requires only that the contribution of the individual cause be more than negligible or theoretical. (*Ibid.*) Under this test, a force that plays only an infinitesimal or theoretical role in bringing about injury, damage, or loss is not a substantial factor. (*Ibid.*) In contrast, a very minor force that does cause harm is a substantial factor. (*Ibid.*)

Under the substantial factor test, "proximate cause is ordinarily a question of fact for the jury." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 198.) "The issue cannot be decided as a matter of law unless the only reasonable conclusion from the [evidence] is an absence of causation." (*Ibid.*)

In this case, the trial court determined the expenses Via Appia claimed as damages were incurred *solely* as the result of the agreement between Via Appia and OPD. Consequently, we consider the principles addressing when an injury may have more than one proximate cause. In *Cole v. Town of Los Gatos* (2012) 205 Cal.App.4th 749, the court explicitly rejected the argument "that an injury can have only one cause, or that only one tortfeasor can be held liable for it." (*Id.* at p. 769.) Instead, the court recognized that "it is entirely possible for an injury to result from multiple tortious acts or omissions, in which case all authors of the injurious conduct may be liable, provided the

17.

conduct of each satisfies the test of proximate or legal cause." (*Ibid*.; see Rest.2d, Torts, § 430, com. d.) Similarly, CACI 431 addresses multiple causes by stating:

> "A person's negligence may combine with another factor to cause harm. If you find that [*name of defendant*]'s negligence was a substantial factor in causing [*name of plaintiff*]'s harm, then [*name of defendant*] is responsible for the harm. [*Name of defendant*] cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing [*name of plaintiff*]'s harm."

### 2.     *Methods of Proof*

Our Supreme Court has addressed how to prove causation in a legal malpractice action. (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1239–1244 (*Viner*).) We conclude that discussion of causation is useful in this appeal because Via Appia had sued Brokers for professional negligence. In *Viner*, the Supreme Court stated that "a plaintiff in a transactional malpractice action must show that but for the alleged malpractice, it is more likely than not that the plaintiff would have obtained a more favorable result." (*Id.* at p. 1244.) Explaining how to prove that a more favorable result would have been obtained, the court stated:

> "Determining causation always requires evaluation of hypothetical situations concerning what might have happened, but did not. In both litigation and transactional malpractice cases, the crucial causation inquiry is what would have happened if the defendant attorney had not been negligent. This is so because the very idea of causation necessarily involves comparing historical events to a hypothetical alternative." (*Id.* at p. 1242.)

Similarly, establishing causation for purposes of the professional negligence claim against Brokers requires a trier of fact to determine what would have happened if Brokers had not been negligent—that is, if they had timely disclosed material facts to Via Appia. This method of proof is compatible with how causation and reliance are proven in cases of fraud by concealment, where a plaintiff must plead and prove that it "would have behaved differently if the information had been disclosed." (*Torres v. Adventist Health*

*System/West* (2022) 77 Cal.App.5th 500, 514.) This difference in behavior is the hypothetical alternative described in *Viner*.

>    3.    *Comparison of Historical Events to Hypothetical Alternative*

In "comparing historical events to a hypothetical alternative" (*Viner*, *supra*, 30 Cal.4th at p. 1242), we note that the evidence establishing the relevant historical events has been set forth in part II.B. of this opinion. That evidence shows Via Appia incurred and paid some engineering expenses in 2015, after the parties entered into the exclusive representation agreement.

The evidence of a hypothetical alternative—specifically, an alternative where Brokers did not conceal information—includes Berlogar's declaration. Because Berlogar was the managing member of Via Appia (i.e., its decision maker), his statements about what Via Appia would have done differently if it had been fully informed constitutes sufficient evidence of a hypothetical alternative. That alternative can be compared to actual events to determine if the failure to disclose information was a substantial factor causing Via Appia to incur expenses. Stated another way, if a trier of fact finds Berlogar's testimony about what Via Appia would have done differently is credible, the trier of fact reasonably could find that, if Brokers had timely disclosed information, Via Appia would not have incurred some or all of the engineering expenses incurred in 2015. Berlogar's credibility presents a triable issue of fact. In turn, whether the allegedly wrongful conduct of Brokers was a substantial factor in causing damage to Via Appia also is a triable issue of material fact. As a result, the Brokers' motion for summary judgment should have been denied.

Accordingly, our reversal of the judgment and remand for further proceeding places the case "at large." (See *Regents of University of California v. Public Employment Relations Bd.* (1990) 220 Cal.App.3d 346, 356–357 [" 'The effect of an unqualified reversal ("The judgment is reversed") is to *vacate* the judgment, and to leave the case "at

large" for further proceedings as if it had never been tried, and as if no judgment had ever been rendered' "].) Therefore, this opinion does not imply the trial court correctly or incorrectly determined that damages from a loss of sale or development were uncertain, based upon conjecture, and speculative and, similarly, does not reach the arguments related to nominal damages (see fn. 5, *ante*).

## DISPOSITION

The judgment is reversed. The trial court is directed to vacate its order granting Brokers' motion for summary judgment, enter a new order denying that motion, and conduct further proceedings that are not inconsistent with this opinion.

Via Appia, LLC shall recover its costs on appeal.

FRANSON, J.

**WE CONCUR**

HILL, P. J.

LEVY, J.

20.